UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MICHAEL WILLS,

                           Plaintiff,                      **REPORT AND**
                                                      **RECOMMENDATION**
      -against-                            18-CV-2464 (JMA) (ARL)

CSC HOLDINGS, LLC *doing business as* Altice USA
*also known as* Optimum *formerly doing business as*
Cablevision Systems Corp,

                           Defendant.
-------------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

       The plaintiff, Michael Wills ("Wills"), commenced this action against the defendant,

CSC Holdings, LLC ("CSC"), alleging that it discriminated against and harassed him on the

basis of his race and color in violation of Title VII, 42 U.S.C. 2000e *et seq*., Section 1981 of the

Civil Rights Act of 1866, 42 U.S.C. § 1981, the New York State Human Rights Law, New York

Executive Law §§ 290 *et seq*. (the "NYSHRL"), and the Nassau County Human Rights Law,

Nassau County Administrative Code Title C-2 § 2 1-9.8 *et. seq.* (the "NCHRL").  Before the

Court, on referral from District Judge Azrack, is the defendant's motion for summary judgment

pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below, the undersigned

recommends that the defendant's motion be granted.

## BACKGROUND

### A.    Factual Background

       The following facts, drawn from the Complaint and the parties' Local Civil Rule 56.1

Statements, are construed in the light most favorable to the non-moving party, except as

otherwise noted.  *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

## 1.    The Parties

Wills is a black man who was employed by CSC for four years.  Def.'s 56.1 Stmt. ¶ 3; Compl. ¶ 26.  CSC is a provider of broadband, cable television, telephone services, Wi-Fi hotspot access, proprietary content and advertising services.  Def.'s 56.1 Stmt. ¶ 1.  CSC has been known in the past as Cablevision but currently does business as Altice USA and/or Optimum.  *Id*.

## 2.    Wills' Employment History

CSC hired Wills as a Residential Account Executive ("RAE") on September 28, 2011. *Id.* ¶¶ 8-9.  RAEs sell CSC's services to former and new residential customers by going door-to-door to customers' homes and attempting to make direct sales.  *Id.* ¶ 11.  Wills initially worked out of CSC's office in Freeport, New York.  *Id.* ¶ 12.  Wills first supervisor in Freeport was Hugh Johnson ("Johnson").  *Id.* ¶ 13.  Beginning in 2014, Wills was supervised by Carmine Pero ("Pero").  *Id.* ¶ 14.  After Pero, Wills was supervised by Diane DiPaola ("DiPaola") and then by Eric Zimmerman ("Zimmerman").  *Id.* ¶¶ 16-7.  Sam Hassan ("Hassan") was the manager of the Freeport office between 2011 and 2013.  *Id.* ¶¶ 18, 20.  After Hassan was fired, Pero took over as the manager.  *Id.* ¶ 21.

From January through September of 2014, Wills was out on Family Medical Leave Act ("FMLA") leave.  *Id.* ¶ 19.  Then, in March 2015, Pero was transferred to CSC's Hauppauge office to take over as its manager.  *Id.* ¶ 22.  Wills voluntarily moved to CSC's Hauppauge office so he could continue working with Pero.  *Id.* ¶¶ 23-4.  When Wills arrived at the Hauppauge office, he was supervised by Zimmermann, who had also been relocated from the Freeport office.  *Id.* ¶ 28.  After Zimmerman, Wills was supervised by Tom Farina ("Farina"). *Id.* ¶ 29.  Farina remained Wills' supervisor until Wills was terminated.  *Id.*

2

At some point, prior to January 2014, Wills applied for a position as a chauffeur with CSC. *Id.* ¶ 177. During the course of his employment, he never applied for a supervisor position. *Id.* Indeed, it is undisputed that Wills never applied for any other positions at CSC or sought to be promoted other than pursuing the chauffeur job. *Id.* ¶ 178.

### 3.    Wills' Performance History

When Wills was hired in 2011, Wills took part in a new hire orientation and was required to review CSC's policies. *Id.* ¶ 30. At the time, he also received CSC's employee handbook and its non-discrimination and harassment policy. *Id.* ¶ 31. In addition, Wills received updated company policies throughout the course of his employment. *Id.* ¶ 32. Despite being well-advised of his job requirements, Wills admits that he failed to meet his sales goals on a number of occasions and was placed on several performance improvement plans. *Id.* ¶ 33. For example, on February 6, 2012, Wills was placed on a Developing Sales Representative or "DSR" plan due to his failure to meet his minimum sales goals. *Id.* ¶ 34. In fact, in May 2012, CSC had planned to terminate Wills based on his failure to meet those goals. *Id.* ¶¶ 35-6. However, rather than terminate him, on June 4, 2012, Wills was placed on a second DSR plan. *Id.* ¶ 37.

On March 1, 2013, and again on November 4, 2013, Wills was placed on a Representative Action Plans ("RAPs") for failure to meet his sales minimums. *Id.* ¶ 38. In 2013 and 2014, Wills also received "needs improvement" ratings at his year-end reviews. *Id.* ¶ 42. By October 1, 2015, Wills was placed on a Direct Sales TIP plan due to his failure to meet minimum sales goals. *Id.* ¶ 39. Indeed, Wills' 2015 year-end performance review stated:

> You also fell well below expectations with regard to involvement with boosts and training, with many, many instances in which you were not engaged, even to the point where you appeared to be sleeping and were observed to do so by the entire staff present. This is unacceptable and needs to be improved. There were very few moments in which you did participate in a positive, constructive

way and for those rare and discrete events, I thank you and would like you to try to make that the norm.

*Id.* ¶ 39.  Despite CSC's criticism, in 2015, Wills was upgraded from "needs improvement" to "valuable contributor" because his overall sales totals met company standards for the year.  *Id.* ¶¶ 33, 41.

### 4.    Hassan's "Big Boy" Comment

In the meantime, at some point in 2013, Wills complained to a Human Resources ("HR") representative in the Freeport office that Hassan was calling him "big boy." *Id.* ¶ 240.  Wills, who is six foot four inches tall and weighs 300 pounds, contends that the use of the phrase was insulting and racially insensitive because it included the word "boy." *Id.* ¶ 272.  Wills complained about the comment orally and on only one occasion.  *Id.* ¶ 241.  Wills recalls that the HR representative said that he or she would look into the matter.  *Id.* ¶ 242.

### 5.    Wills' History of Reprimands and Warnings

#### a.    *Circulation of the Hassan Email*

In addition to the inconsistent sales performance described above, beginning in 2013, Wills was reprimanded on several occasions.  First, on July 16, 2013, Wills was required to meet with Tom LoCascio ("LoCascio") and Colleen Long ("Long"), Vice Presidents at CSC, concerning an email he sent to Hassan regarding an employment open house.  *Id.* ¶ 43.  The Hassan email, which Wills also sent to all of the other RAEs in his office, stated:

Sam:

With all due respect to this position and our office, would YOU recommend this position to your son, nephew OR even worse, your daughter or neice [sic.] to do the following:

1) Be college educated with at least 60 college credits
2) Base pay of $25K for one year

> 3) First 10 sales pay $75.00 per sale (Taxed at 43%)
> 4) Must have your own car and pay for your own gas

> Twenty six years ago, 26 YEARS, I started with the state police at the academy starting salary of $22,530.13 per year.  After six months and graduating (not including OT), I was clearing more than a person would be coming here.  Would I have my or someone elses [sic.] son or daughter walk these streets at night in all weather, knock on strangers doors, enter strangers' houses, fail over 90% of the time . . . all for a good health and dental plan?  I have referred at least five people to this job before all the changes took effect.  When CABLEVISION gets serious about fairly paying the quality people they really seek, please send me another email.

> Mike

*Id.* ¶ 44.  It appears from the record that the meeting with LoCascio and Long was focused, in large part, on why Wills had copied all of the RAEs in the Freeport office on that email.  *Id.* ¶ 43.

b.    *The Johnson Incident*

In September 2013, another incident arose surrounding a request by Wills' supervisor, Johnson, for assistance "fixing" a traffic ticket.  According to Wills, in early September, his supervisor came to his home one afternoon seeking his help fixing a traffic ticket.  *Id.* ¶ 43.  Wills explains that Johnson did so because Wills was a former police officer.  *Id.* ¶ 47.  According to the parties, while Johnson waited for Wills outside his home, Johnson observed Wills' car in the driveway all afternoon.  *Id.* ¶ 49.  Consequently, Johnson accused Wills of not working that day.  *Id.*  Wills contends that he was working but was driving his son's car.  *Id.* ¶ 50.  In any case, Wills says he refused to fix the traffic ticket.  *Id.* ¶ 48.

Approximately two weeks later, on September 19, 2013, Wills sent Pero an email telling him not to trust Johnson.  *Id.* ¶ 45.  The email stated:

> I say this to you in the strict confidentiality. DO NOT TRUST HUGH JOHNSON NO FURTHER THAN YOU CAN SEE HIM.  If he goes out of

> his way and tries to screw people under him OR should I say how many people has he scraped off the bottom of his shoe to make himself look better, what do you think he may one day try to do to you? . . . NO ONE LIKES A RAT! He does NOT have the respect of most RAEs because if he has to go to you and HR behind the backs of the people he works with which means he has NO leadership skills himself. A respected person of higher management leads himself, has the respect AND trust of the people he is trying to lead. He does not need to follow them around, play games of "got-cha" report and rat people out and then smile in their faces the next day. . .. For your sake, keep an eye on this guy. . . he has shown he cannot be trusted!

*Id.* ¶ 46. Thereafter, Wills was required to meet with Hassan, Johnson, a "lady from HR" and another supervisor, Christopher Booker, to address Johnson's accusation that he had been at home during a shift. *Id.* ¶ 51. Wills told the woman from HR that Johnson had asked him to fix a traffic ticket but admitted that he did not know if Johnson's accusation regarding his failure to work was a result of his refusal to do so. *Id.* ¶ 53. Nevertheless, on September 25, 2013, Wills received a Corrective Action Memorandum as a result of both his July 16, 2013 email to Hassan and September 19, 2013 email to Pero. *Id.* ¶ 54.

Wills admits that he received the Corrective Action Memorandum for failure to treat his colleagues in a professional, courteous and respectful manner. *Id.* ¶ 55. The Memorandum also noted that Wills had violated the Direct Sales Standards, Practices and Procedures Policy, which requires that RAEs respond to management within 30 minutes during business hours, because Wills had failed to return texts or calls from Johnson and Booker for an entire week. *Id.* ¶ 56. Wills has testified that he was aware of the policy requiring RAEs to return calls from supervisors or managers within 30 minutes but argues that he had not, in fact, refused to return their calls. *Id.* ¶¶ 58-9. Nonetheless, Wills says that after he received the September 25, 2013 Corrective Action Memorandum, he understood that CSC had perceived calling Johnson untrustworthy and a "rat" as disrespectful and unproductive. *Id.* ¶ 60. Accordingly, Wills

signed the Memorandum and did not add comments even though he disagreed with CSC's determination that he had not returned Johnson's and Booker's calls. *Id.* ¶¶ 61-3.

         c.     *Wills' October 2014 Final Written Warning*

On October 22, 2014, Wills received the first of two Final Written Warnings. *Id.* ¶ 68. The Final Written Warning was issued after he failed to notify management that he was taking a personal day on October 18, 2014. *Id.* ¶ 69. Wills claims that he orally advised Zimmermann, his supervisor at the time, that he would be taking the day off. *Id.* ¶ 70. However, on October 18, 2014, Zimmermann called him on the telephone and reported that because Wills had not put his request for a personal day, in writing, he would be considered a "no-show." *Id.* ¶ 71. Wills insisted that he had told Zimmerman that he was taking that Saturday off and Zimmerman confirmed his understanding. Pl.'s 56.1 Counter-Stmt. ¶ 66. Wills then complained to Pero about the incident. *Id.* ¶ 74. Pero responded "unfortunately, we have to take Eric's word for this." *Id.* ¶ 75. Wills, once again, signed the Final Written Warning and did not write any comments on it although he had the opportunity to do so. *Id.* ¶ 73.

         d.     *The Find Friends Application and the Documented Verbal Warning*

Wills was also reprimanded concerning his failure to keep the Find Friends application active on his company-issued iPad while he was working. *Id.* ¶ 78. It is undisputed that Wills knew that it was his responsibility to have the application turned on because it allows supervisors to track the location of RAEs when they are in the field. *Id.* ¶¶ 78-80. According to the parties, on September 12, 2015, Farina, Wills' supervisor at the time, sent him an email reminding him to leave the Find Friends application active on his company-issued iPad. *Id.* ¶ 78. According to Wills, his practice was to "unfriend" his supervisors at the end of each of his shifts, which forced his supervisors to send him fresh friend requests at the start of each workday if they wanted to

track his whereabouts. *Id.* ¶¶ 83-4. Five days later, Zimmermann also sent Wills an email with the subject line "Find Friends app" reiterating the requirement that he keep the Find Friends application on and accept supervisors' friend requests. *Id.* ¶ 85.

It appears that Wills did not immediately change his practice because on October 29, 2015, CSC's HR Manager, Erica Simon ("Simon"), also met with Wills regarding his failure to keep the Find Friends application turned on. *Id.* ¶ 86. The following day, Steven Spalletta ("Spalletta"), one of CSC's supervisors asked a group of RAEs if their Find Friends application was turned on and Wills, who was part of the group, responded "What is it with all of you and this app?" *Id.* ¶ 87. When Spalletta tried to explain the importance of the Find Friends application, Wills walked out of the office and said he would take personal time for the rest of the day. *Id.*

Two days later, Zimmermann sent Wills an email reiterating that he had to have the Find Friends application turned on, saying "[a]s discussed many times with you, it is a current requirement for you to activate it during working hours." *Id.* ¶ 88. Zimmermann also used the opportunity to advise Wills that he should change his mobile telephone ring tone from the Star Wars Imperial Death March because that ring tone was not appropriate. *Id.* Ultimately, on November 4, 2015, Wills met with Simon and Pero and agreed to change his ring tone, to ensure that location services and Find Friends was on during business hours, to treat his managers and co-workers in a respectful manner, and not to write anything in emails that could be perceived as insubordinate. *Id.* ¶ 92.

Five days later, Wills received a Documented Verbal Warning memorializing those discussions. *Id.* ¶ 93. The Documented Verbal Warning referenced Wills' failure to comply with the Find Friends policy and the October 30, 2015 incident with Spalletta. *Id.* ¶¶ 93. The

8

Documented Verbal Warning also addressed a separate email Wills had written on November 3, 2015 regarding Zimmermann. *Id.* According to the parties, four days earlier, Wills had told Spalletta that he shoved a customer after the customer spat or punched him in his face. *Id.* ¶ 89. Later that day, Wills told Spalletta that he made the story up and was joking. *Id.* Afterwards, Wills sent Long an email stating that he had been joking when he described the altercation with the customer and that Spalletta should have known he was joking. *Id.* ¶ 90. But, at the end of the email, Wills then stated "Now I'm not joking. Steve, are you kidding me?" *Id.* On November 3, 2015, Wills also sent Pero an email about Zimmermann in which he stated "I truly believe that while he is in the process of trying to 'snitch' on me, he is really making himself look bad and unprofessional by being inaccurate and childish." *Id.* ¶ 91. For this reason, in the Documented Verbal Warning, CSC included a reminder to Wills of its policy that all persons with whom a RAE comes into contact must be treated in a professional, courteous and respectful manner. *Id.* ¶ 94. Wills signed the November 9, 2015 Documented Verbal Warning on November 10, 2015 and did not write any comments. *Id.* ¶¶ 97-8. Notably, Wills does not allege that he received the November 9, 2015 Documented Verbal Warning because of his race or color. *Id.* ¶ 99.

       e.     *The February 22, 2016 Final Warning and the Incidents Leading up to its Issuance*

Approximately three months later, Wills received a second Final Warning for insubordination and disrespectful behavior in violation of the Residential Direct Sales Standards, Policies and Procedures. *Id.* ¶¶ 101-02. It appears that on December 16, 2015, Wills had sent another email to Pero, copying others, saying "Carmine, you have got to be kidding me," after Pero refused to approve one of his installations at a promotional rate. *Id.* ¶ 103. Shortly

9

thereafter, Wills was on a non-company website during a boost meeting. *Id.* ¶ 105. According to the parties, "boost meetings" are mandatory meetings for RAEs at the beginning of their shift because they are used to share information and/or motivate the RAEs. *Id.* ¶ 106. At that time, Wills was told not to view non-company websites during future boost meetings and to pay full attention and he agreed to do so. *Id.* ¶ 107.

While no incident took place in January 2016, by February 10, 2016, Wills was told to return to CSC's office from the field because Zimmermann, once again, could not locate him with the Find Friends application. *Id.* ¶ 108. Wills testified at his deposition that he had not unfriended Zimmermann but acknowledges that CSC believed that Zimmerman could not locate him. *Id.* ¶ 109-10. Indeed, on February 10, 2016, Farina confirmed that Zimmermann had been deleted from the Find Friends application on Wills' company-issued iPad, making it impossible for Zimmerman to track his whereabouts using his Company-issued iPad. *Id.* ¶ 111. Wills then admitted that Zimmermann had been deleted from the Find Friends application on his company-issued iPad but denied that he was the one who had deleted the contact. *Id.* ¶ 112.

Nevertheless, Wills testified at his deposition that no one besides him had access to his company-issued iPad in February 2016. *Id.* ¶ 113. Wills also indicated that he believes that the emails he received from Zimmermann questioning why he had turned off his Find Friends application or unfriended Zimmermann were sent to him because of his race or color. *Id.* ¶ 155. Indeed, Wills says he showed CSC proof that on one occasion he had accepted Zimmermann's friend request even though Zimmermann said he had failed to do so. *Id.* ¶ 156.

Then, in February 2016, there were several instances when Wills failed to collect customers' social security numbers at the time of sale. *Id.* ¶ 116. Wills does not dispute that pursuant to CSC's 2015 Residential Direct Sales Standards, Policies and Procedures, "all sales

orders must include the following information. . . [c]ustomer's social security number." *Id.* ¶ 114.  Wills admits that CSC's policy prevented him from using alternative forms of identification at the time of a sale without first obtaining a supervisor's approval.  *Id.* ¶ 115. In fact, Farina coached Wills several times regarding his failure to collect customers' social security numbers and directed that he collect the information when making sales.  *Id.* ¶¶ 117, 120-21.  However, despite the coaching, Wills continuously failed to collect customers' social security numbers at the point of sale because he was uncomfortable asking people for their social security numbers.  *Id.* ¶¶ 118-19.

Accordingly, on February 19, 2016, when CSC issued the second Final Warning, CSC also noted that after Farina had coached Wills regarding the policy, Wills still made a sale without obtaining the customer's social security number and without approval from a member of the management team.  *Id.* ¶ 124.  During his deposition, Wills did not recall whether he made a sale without obtaining the customer's social security number or obtaining approval from a member of the management team.  *Id.* ¶ 125.  However, Wills did note that Mark Schutzmann, a former CSC employee, had made "mistakes" entering information into the Customer Verification Tool and was not disciplined for his error.  *Id.* ¶ 124.

Then, during a February 17, 2016 boost meeting, Wills stood up when Pero was reminding the RAEs about professional conduct and said "It's ok to vent with each other and to speak negatively and we all need to hear the good, bad and the ugly." *Id.* ¶ 126.  As such, the February 22, 2016 Final Warning also mentioned Wills' comment during the boost meeting. *Id.* ¶ 127.  Indeed, the Final Warning indicated that, during the meeting, Wills had also said "I have to boost up Robyn Lynch and other RAE's because of the incompetence of the supervisors." *Id.*  Wills denies that he made the comment during the boost meeting but admitted

stating to all the RAEs that another RAE, Robyn Lynch, felt that Zimmermann's advice to her "rose to a level of incompetency." *Id.* ¶ 128. Pero immediately suggested that such issues were better discussed in private instead of in front of the group. *Id.* ¶ 129.

On February 18, 2016, Simon met with Wills to inform him that his behavior during the February 17, 2016 boost meeting was unacceptable and further discussed the fact that there were several instances in the past in which his tone or treatment of others had been inappropriate and disrespectful. *Id.* ¶ 130. Wills responded that he did not feel his emails were disrespectful, only straightforward, but agreed to be more mindful of the tone and content of his emails. *Id.* Nonetheless, the boost meeting was another item covered in the February 22, 2016 Final Warning. *Id.* ¶ 131. As he had in the past, Wills signed the February 22, 2016 Final Warning two days later and did not comment. *Id.* ¶¶ 132-33.

f.    *Wills' Coworkers*

Wills was not terminated, suspended, or demoted, nor were his wages affected as a result of the February 22, 2016 Final Warning. *Id.* ¶ 135. Still, Wills now suggests that other people at CSC also stood up in meetings and did similar things but were not disciplined. *Id.* ¶ 136. For example, Wills alleges that Ulysses Colon ("Colon"), Joseph Graci, Michael Sedlack, Robert Sharpe, Richard Cuba and James DiSilvio were white RAEs and were treated differently than him. *Id.* ¶ 137. Specifically, he argues that those individuals were also outspoken in meetings and were not terminated. *Id.* ¶ 142. Wills admits, however, that he has no real knowledge of any of those individuals' performance ratings, sales figures, supervisors, discipline history, personnel file contents or length of tenure at CSC. *Id.* ¶ 138. He was also unable to recall at his deposition if any of those individuals had difficulty collecting social security numbers from customers or whether any of those individuals had refused to keep their Find Friends application

12

on. *Id.* ¶¶ 139-40.  Yet, Wills points out that Colon had numerous company violations, including refusing to answer phone calls or to respond to phone calls by members of management, and he was not terminated.  *Id.* ¶ 140.  Wills believes that the reason Colon and his other coworkers were treated differently when they made rebellious statements is because of their race.  *Id.* ¶¶ 143-4

g.    *Other Incidents*

Wills also admits that in 2015 or 2016, on a plane ride from Aruba to New York, he complained to Long that another RAE, Alexia Agnant ("Agnant"), should have been included on the President's Club travel incentive trip.  *Id.* ¶ 246.  Interestingly, Wills had not earned the President's Club travel incentive trip to Aruba; rather, he had paid his own way so he could be there at the same time as the President's Club travel incentive winners.  *Id.* ¶ 247.  Wills testified that during the flight he said to Long, "I'm here protesting the fact that Alexia wasn't brought on this trip." *Id.* ¶ 248.  He said was protesting because he believed that Agnant deserved to go on the trip but was not allowed to go because of a minor disciplinary issue.  *Id.* ¶ 254.  Indeed, Wills wore a t-shirt throughout the trip that said, "4 Alexia." *Id.* ¶ 258.  During the flight, Long indicated that she was not able to discuss the matter with him.  *Id.* ¶ 249.  Wills does not recall telling Long that he thought the reason "Alexis" was not on the trip was because of her race or her gender.  *Id.* ¶ 250.

Wills has also testified that on May 7, 2016, he sent Zimmerman an email, the topic of which is not identified, stating "outlets 4 & 5 waived. . . speletta[sic.]" *Id.* ¶ 157.  Zimmermann responded, "It's Spalletta." *Id.* ¶ 158.  Upon receipt of Zimmerman's email correcting the spelling of Spalletta's name, Wills sent Zimmerman another email to Zimmermann that stated "eric [sic.] . . . did you fully understand who I was referring to or is there someone else in this

office that you are confusing this name with? It's insulting. . . please stop!" *Id.* ¶ 159.  Wills

copied Spalletta, Farina, Ashina Alikahn, and Laura Rojas on the second email.  *Id.*  Wills

testified that he added members of management to his response because it was insulting for

Zimmermann to correct his spelling.  *Id.* ¶ 165.  Wills then forwarded the email to Simon in HR

stating ". . . was this necessary after I made a sale on a day I didn't have to work?" *Id.* ¶ 160.

Simon responded, "Thank you for sending to me. I'll address it with him on Monday." *Id.* ¶ 161.

The next day, Wills wrote to Simon and stated:

> now you may realize why respecting eric [sic.] professionally is challenging
> for me and many others in our office. This is a prime example of him trying to
> 'pull me in' for no reason whatsoever. Of all the positive things this moment
> presented, this is how he chose to lead. Very bad show for someone who is
> responsible for setting a positive example.

*Id.* ¶ 162.  Wills said he did so because he speculated that Zimmermann's correction of his

spelling of Mr. Spalletta's name was "possibly" because of his race or color.  *Id.* ¶¶ 163, 167.

Nonetheless, Wills testified at his deposition that an incorrect spelling can delay the processing

of orders.  *Id.* ¶ 169.

### 6.    Wills' Claims of Discrimination and Harassment

On June 6, 2016, Wills sent an email to Simon with the subject line "harassment"

complaining that Farina contacted him during his off-duty hours.  *Id.* ¶ 259.  Wills admits that

despite the subject line, he did not send the June 6, 2016 email because he believed that Farina

was harassing him based on his race or color.  *Id.* ¶ 261.  Indeed, Wills did not complain to

Simon of discrimination or harassment in that email.  *Id.* ¶ 262.  Wills has testified that besides

the 2013 conversation with the HR representative in Freeport regarding the "big boy" comments

and the conversation with Long on the plane about his co-worker, he did not recall complaining

14

to anyone else at CSC that he felt he was being discriminated against or harassed due to his race or color. *Id.* ¶ 263.

In addition, in 2012, Wills also complained to Jamila Houston ("Houston"), a Human Resources manager in the Bethpage office, that he was being harassed because he had responded to an email from Hassan threatening to terminate RAEs who had been unable to make sales during the week of Hurricane Sandy. *Id.* ¶ 264. Wills further alleges that during that same conversation he told Houston that he was being referred to as "big boy" by Hassan and that the harassment had to stop. *Id.* ¶ 265. Despite his limited complaints of harassment or discrimination, Wills still contends that the primary factor in CSC's termination of his employment was race. *Id.* ¶ 268. Indeed, Wills asserts that in June 2016, Zimmermann singled him out during a boost meeting because of his race or color. *Id.* ¶ 154.

Then, at some point, Wills filed a complaint with the New York State Division of Human Rights to which he attached an offensive image that referred to Hitler as the "most underrated cook of all time." *Id.* ¶ 170. He says he received a copy of the image from a former employee of CSC, George Scarpias. *Id.* Wills believes that the image was somehow linked to a CSC employee, Daniel Ferrara ("Ferrara") and posted to a Facebook group called "Levittown Dads." *Id.* ¶ 171. Wills acknowledges that he is not friends with Ferrara on Facebook. *Id.* ¶¶ 172-74. In any case, Wills testified that someone, whose name he does not recall, told him that he or she was asked by CSC not to cooperate with the New York State Division of Human Rights investigation of his complaint. *Id.* ¶ 175.

### 7. Wills' Termination

In any case, on June 28, 2016, Ferrara submitted a Termination Request for Wills that described his disciplinary history and detailed continued policy violations and instances of

15

disrespect after the issuance second Final Warning. *Id.* ¶ 181. The Termination Request first included a description of an incident that on March 17, 2016. *Id.* ¶ 182. Specifically, Wills had called Spalletta "to request approval for an additional outlet" at a job. *Id.* An "outlet" on a Sales Order Form means the wiring required to connect a cable box. *Id.* ¶ 183. At the time, CSC charged customers a fee for every additional outlet after the first three outlets. *Id.* ¶ 184. As such, RAEs needed to request and obtain approval from a supervisor before they were permitted to waive outlet fees. *Id.* ¶ 185. Spalletta was not able to answer the call and Wills did not leave a voicemail. *Id.* ¶ 182. Instead of contacting another supervisor in his area, which he was required to do, Wills decided to call the LI West Manager, Michael Haggerty, for approval. *Id.* Wills does not recall why did reach out to another supervisor in his office but thinks it may have been because, prior to going into the field, he had been told that all the supervisors would be in a meeting. *Id.* ¶ 187. Accordingly, Wills says that he reached out to Haggerty because he did not have another person to contact for approval. *Id.*

To this end, the Termination Request stated that on March 17, 2016, Farina had spoken with Wills regarding his decision not to call the other two supervisors or the manager in the LI East office and reiterated the importance of following CSC's procedures. *Id.* ¶¶ 189-90. Nonetheless, less than two months later, on May 3, 2016, Wills tried contacted Pero for approval to waive an outlet fee when he could not reach Farina despite having been coached not to do so in March. *Id.* ¶ 191. It appears Wills also had difficulty reaching Pero that day so he called the other manager, Haggerty. *Id.* ¶ 192. Wills does not dispute that his conduct was inconsistent with CSC's policy. *Id.* ¶ 193.

Moreover, according to the Termination Request, Wills was dishonest with Haggerty in May, telling him that before calling he had already tried to call the management team in the LI

16

East. *Id.* ¶ 194.  Wills denies that he was dishonest.  Pls. 56.1 Counter-Stmt. ¶ 194.  He says that the telephone conversation that he had with Haggerty was very short and Haggerty granted his request.  *Id.*  However, Wills does acknowledge that he does not recall whether he told Haggerty that he had tried to reach other supervisors before reaching out to him.  *Id.* ¶ 196.

Moreover, the Termination Request stated that Pero and Simon called Wills that day to discuss his failure to follow CSC procedures and that Wills explained that he was with an upset customer and wanted to resolve the situation as quickly as possible so he felt it was warranted not to follow process.  *Id.* ¶ 197.  Wills then claimed that he had not called the LI East supervisors but later admitted that he only tried to reach Farina and Pero before calling Haggerty.  *Id.*  Wills was reminded that the May incident was not the first time he had failed to follow CSC process regarding contacting management to obtain approvals or for business related questions.  *Id.* ¶ 197.

The Termination Request also referenced and incident in April 2016, when Wills was supposed to work until 6 p.m. but knocked on his last door at 5:13 p.m.  *Id.* ¶ 200.  According to the parties, when Farina asked Wills for an explanation, Wills stated that his iPad battery went dead.  *Id.*  As such, Farina reminded Wills that he was supposed to call, text or email a member of management if his iPad battery died.  *Id.*  Wills stated that he did not do so because he was with a customer.  *Id.*

In addition, two weeks before Ferrara submitted the Termination Request, Farina had called Wills on his scheduled day off and he responded with the following text:

> Tom. . . please tell me what I have to do OR what needs to be said for you to
> RESPECT me and my wishes and NOT CALL MY PHONE OR DISTURB
> ME with company business on my day off or off duty hours? Are you telling
> me that your calling me today with this business is SO URGENT that it could
> not wait until tomorrow afternoon? How many times do I have to ask you the

> same thing not to do? If you absolutely need to put this order in no schedule
> today for an install on Thursday, just go ahead and do it. Frankly speaking,
> enough is enough!!!!!!

*Id.* ¶ 201. Farina responded, "Was instructed to call you from carmine [sic]." *Id.* ¶ 202.

Apparently, Pero had instructed Farina to contact Wills to resolve an issue with an order so it

could be processed. *Id.* ¶ 203. Wills then responded, "Forgive me for being straight forward

and to the point but I honestly do NOT believe you. Now on top of disrespecting me, you're

insulting me as well." *Id.* ¶ 204.

At his deposition, Wills was asked about the text exchange with Farina, who was his

supervisor at the time. *Id.* ¶¶ 205-06. Wills testified:

> Q: Did you have any proof that Mr. Farina was lying to you or is that just your
>
> belief?
>
> A: That was my belief.

Indeed, Wills acknowledges that he was an exempt employee who could be contacted before his

shift started or after it ended. *Id.* ¶ 207. Wills also has no knowledge of whether his supervisors

also contact other RAEs during their off-duty hours. *Id.* ¶ 208.

Finally, five days before Ferrara submitted the Termination Request, Wills was, once

again, called out for failing to pay attention at a boost meeting and viewing a non-Company

website during the meeting. *Id.* ¶ 209. Specifically, Zimmermann asked Wills to pay attention

during the meeting because Wills was on his phone watching a video. *Id.* Indeed, Zimmermann

spoke to Wills twice during the meeting. *Id.* ¶ 210. Wills says that he did not recall what

Zimmermann said the first time, but the second time Zimmermann caught his attention and said

"Mike, I said pay attention." *Id.* Wills says after the second comment, he put his phone on the

desk and lifted his head up. *Id.* ¶ 212. He also started to intently stare at Zimmermann and

continued to do so for about twenty seconds. *Id.* ¶ 213. Wills then used his phone to take video of Zimmermann. *Id.* ¶ 215. Wills testified that he did so because Zimmermann was on his phone when he took the video. *Id.* ¶ 216. Yet, Wills does not dispute that Zimmermann was a supervisor, that the boost meetings were not for his benefit, and that Zimmermann was attending to other company business on his phone. *Id.* ¶ 217.

It appears that Wills also used his iPad during that meeting to take photographs of other employees. *Id.* ¶ 218. But, none of the employees he photographed on his iPad were on their phones. *Id.* ¶ 219. Robert Sharpe was, however, on his company computer during the meeting and Wills complains that no one told Sharpe to pay attention. *Id.* ¶ 220. Wills acknowledges that he does not know if Sharpe had similarly been issued a Final Warning for prior conduct at the time of the June 23, 2016 boost meeting. *Id.* ¶ 222. Nonetheless, he complains that Sharpe was not disciplined for looking at his computer. *Id.* ¶ 223.

Following the meeting, Zimmermann stated that he felt threatened by Wills' "dirty stares" during the boost meeting. *Id.* ¶ 213. Wills contends that Zimmerman was advised that he did not have to come to work the next day if he felt threatened by Wills, but Zimmerman said that he would still come into to work. Pl.'s 56.1 Counter-Stmt. ¶ 213. However, Zimmermann did call the local police to explain that he felt threatened. *Id.* ¶ 227. Wills does not dispute that, under the circumstances, Zimmermann would have called the police if a white employee had stared at him in a similar threatening manner. *Id.* ¶ 228.

Later that day, Simon and Pero spoke to Adam Morris ("Morris"), another RAE, regarding the interaction between Zimmermann and Wills during the meeting. *Id.* ¶ 229. Morris reported that he was sitting between where Wills was sitting and where Zimmermann was standing and it was evident that Wills was not listening. *Id.* Morris further stated that

Zimmermann asked Wills, "Mike, can Stephanie get your attention," and Wills responded, "she has my attention." *Id.* ¶ 230.  According to Morris, Zimmermann then said, "I believe you're on your phone and it doesn't look like you're looking at the presentation." *Id.* ¶ 231.  Wills challenged Zimmermann asking why he could be on his own phone and, according to Morris, Zimmermann responded that he was using his phone for work and the presenter was there to present to the RAEs.  *Id.* ¶ 232.  Morris then heard Zimmermann say to Wills, "do you need me to pose for the picture you're taking?" *Id.* ¶ 233.

After the boost meeting, Ferrara, Simon and Pero made the decision to terminate Wills' employment.  *Id.* ¶ 234.

### B.    Procedural History

On January 30, 2017, Wills filed a complaint with the New York State Division of Human Rights.  Compl. ¶ 9.  According to Wills, the New York State Division of Human Rights Regional Director found "probable cause to support the allegations in the complaint." *Id.* ¶ 17.[1] Specifically, he says, that the Regional Director found CSC's writeups to be ill-advised because other non-Black employees were not punished for similar actions.  *Id.* ¶ 18.  Wills also points out that the Regional Director found that Ferrara had, on numerous occasions, posted racist and offensive photographs and comments on his Facebook page.  *Id.* ¶ 19.  Wills further notes that the Regional Director found the finding of insubordination at the June boost meeting to be disingenuous since White employees were engaged in the similar behavior.  *Id.* ¶ 20.  Finally, Wills contends that while the Regional Director stated that although Wills' behavior was

---

[1] In the complaint, Wills cites to exhibits that were not attached to the document when it was filed.  ECF No. 1.

inappropriate, there was a lack of diversity at the management and executive positions at CSC. *Id.* ¶¶ 24-5. Accordingly, on February 5, 2018, the Equal Employment Opportunity Commission issued a right to sue letter. Def.'s 56.1 Stmt. ¶ 7.

As stated above, Wills commenced this action on April 26, 2018, asserting nine causes of action for discrimination, harassment and retaliation. ECF No. 1. Wills' Seventh, Eighth, and Ninth Causes of Action, and any allegations of discriminatory hiring practices brought pursuant to his First and Second Causes of Action under Title VII and his Fifth and Sixth Causes of Action under the New York State Human Rights Law were dismissed with prejudice pursuant to a September 14, 2018 Stipulation and Order. On December 20, 2019, CSC filed the instant motion for summary judgment seeking to dismiss the remaining discrimination, hostile work environment and retaliation claims.

## DISCUSSION

### A.    Standard of Law

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Puglisi v. Town of Hempstead*, No. 10 CV 1928, 2012 WL 4172010, *6 (E.D.N.Y. Sept. 17, 2012) (quoting *In re Blackwood Assocs., L.L.P.,* 153 F.3d 61, 67 (2d Cir. 1998) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc*., 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant,

summary judgment is unavailable.  *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996), *cert denied*, 520 U.S. 1228 (1997).

The trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994).  When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[T]here must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim."  *Jamaica Ash & Rubbish v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *Celotex,* 477 U.S. at 322).  A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case.  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

## B.   The "Big Boy" Comment

As a threshold matter, the Court addresses CSC's contention that Will's hostile work environment/harassment claim is time barred to the extent that it relies on Hassan's "big boy" comment.  Setting aside the fact that the comment appears to have referred to Wills' size not his race or color,[2] it is undisputed that Hassan made the comment in 2013.  Def.'s 56.1 Stmt. ¶ 240.

---

[2] Wills admits that Hassan also called a large and tall white colleague "big boy." Def.'s 56.1 Stmt. ¶¶ 270-271.

"Under Title VII, [a] plaintiff must file an employment discrimination charge with the EEOC either 180 or 300 days after an 'alleged unlawful employment practice occurred.'" *Richardson v. Hartford Pub. Library*, 404 F. App'x 516, 517 (2d Cir. 2010) (citing 42 U.S.C. § 2000e–5(e)(1)). "'In a State[, like New York,] that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC [or state agency] within 300 days of the employment practice.'" *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). If an employee fails to do so, the claim is time barred. *Id.* In this case, Wills filed a complaint with the New York State Division of Human Rights on January 30, 2017. Def.'s 56.1 Stmt. ¶ 6. Accordingly, Wills' Title VII claims based on conduct that occurred before April 5, 2016 are time-barred. Thus, the undersigned recommends that Wills' Title VII claim for harassment and hostile work environment based on the 2013 "big boy" claim be dismissed.

Moreover, the NYSHRL has a three-year statute of limitations, which is tolled for the period between the filing of an EEOC charge and the issuance by the EEOC of a right-to-sue letter. *See Kassner v. 2nd Avenue Delicatessen Inc.,* 496 F.3d 229, 238 (2d Cir.2007) (applying three-year statute of limitations to claims under the NYSHR)*;Ugactz v. United Parcel Serv., Inc., No.* 10-CV-1247, 2013 WL 1232355, at *6 (E.D.N.Y. Mar. 26, 2013)(statute of limitations is tolled during the pendency of a complaint before an administrative body). Here, Wills filed his complaint on April 26, 2018. He filed his complaint with the EEOC on January 30, 2017 and was issued a right to sue letter 371 days later, on February 5, 2018. Accordingly, events that occurred 3 years and 371 days prior to the filing of the complaint, that being, April 21, 2014, are

also time barred under the NYSHRL.  As such, Wills' NYSHRL claim based on the 2013 "big boy" comment is also time barred and the undersigned recommends that it be dismissed.

Finally, claims under Section 1981 have a four-year statute of limitations.  *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 580 (S.D.N.Y. 2011).  Since the alleged "big boy" comment was made prior to 2014, any Section 1981 claims based upon that comment are time-barred and the undersigned recommends that it also be dismissed.

### C.    Wills' Discrimination Claims

### 1.    *Applicable Law*

Title VII prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. 2000e-2(a)(1); *see Richardson v. Commission in Human Rights & Opportunities*, 532 F.3d 114, 119 (2d Cir. 2008).  Section 1981 provides that:

> [a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

42 U.S.C. § 1981.  Generally, claims of disparate treatment under Title VII, the NYSHRL, the NCHRL and § 1981 are assessed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  *See Bowen-Hooks v. City of New York,* 13 F. Supp. 3d 179, 209 (E.D.N.Y. 2014); *see also United States v. City of New York*, 717 F.3d 72, 83–84 (2d Cir. 2013) (application of *McDonnell Douglas* framework to race discrimination claim); *Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 296 (E.D.N.Y. 2014) (applying same framework to NCHRL claim). "However, '[t]he *McDonnell Douglas* test is inapplicable where

24

the plaintiff presents direct evidence of discrimination.  To avoid the burden-shifting analysis, 'the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support [her] allegations of discriminatory treatment.'" *Short v. Fair Hous. Justice Cntr.,* 2012 U.S. Dist. LEXIS 184489 *50-1 (S.D.N.Y. Dec. 4, 2012) (citing *Raskin v. Wyatt Co*., 125 F.3d 55, 61 (2d Cir. 1997) (internal citations omitted)).  Here, Wills has not presented the type of evidence needed to circumvent the *McDonnell Douglas* framework.

At best, Wills suggests that Ferrara, who completed the paperwork for his Termination Request had, on numerous occasions, posted racist and offensive photographs and comments on his Facebook page.  Def.'s 56.1 Stmt. ¶ 170-74.  Although Wills filed a complaint with the New York State Division of Human Rights to which he attached one of those offensive images*, see id.* ¶ 170, the evidence is undisputed that Wills received the Hitler image from a former employee of CSC, George Scarpias.  *Id.*  Moreover, although Wills "believes" that the image was somehow link to Ferrara and posted to a Facebook group called "Levittown Dads, Wills acknowledges that he is not friends with Ferrara on Facebook.  *Id.* ¶¶ 171-74.  In fact, there is nothing in the complaint that suggests that the image was intended for Wills or even circulated within the workplace, and it is certainly not probative of CSC's motive for taking action against Wills.  *See e.g., Shepherd v. BCBG Max Azria Grp., Inc.*, No. 11 CIV. 7634 RJS AJP, 2012 WL 4832883, at *65-6 (S.D.N.Y. Oct. 11, 2012), *report and recommendation adopted sub nom. Shepherd v. Azria*, No. 11 CIV. 7634 RJS/AJP, 2012 WL 6150854 (S.D.N.Y. Dec. 10, 2012) (citing *Renz v. Grey Adver., Inc*. 135 F.3d 217, 224 (2d Cir. 1997)("granting summary judgment to employer because plaintiff's sole evidence of discrimination consisted of isolated remarks by decision-maker that, although inappropriate, were not directed at plaintiff'); *Nugent v. St.*

*Luke's/Roosevelt Hosp. Ctr.*, 2007 U.S. Dist. LEXIS 28274 (S.D.N.Y. Apr. 18, 2007) ("inappropriate gender related remarks made by male supervisor but not directed at female plaintiff were 'insufficient to demonstrate that adverse actions taken against the plaintiff [were] attributable to gender bias)). Accordingly, the Court must proceed with a *McDonnell Douglas* analysis.

Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. *Bowen-Hooks*, 13 F. Supp. 3d at 209. Specifically, a plaintiff must show that he or she (1) belonged to a protected class, (2) was qualified for the position he or she held or sought, (3) suffered an adverse employment action, and (4) did so under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). If the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Stratton v. Department for the Aging*, 132 F.3d 869, 879 (2d Cir. 1997). The employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a Court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.,* 192 F. Supp. 2d 100, 111 (W.D.N.Y. 2002) (citing *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985). Indeed, federal courts do not have a "roving commission to review business judgments," *see Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989), and may not "sit as super personnel departments, assessing the merits — or even the rationality — of employers' non-discriminatory business decisions." *Mesnick v. General Elec. Co*., 950 F.2d 816, 825 (1st Cir. 1991). Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish

26

a question of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir. 1988).

If the employer establishes a legitimate nondiscriminatory reason for its actions, the *McDonnell Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non," and the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000). In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir. 1995); see *Patterson v. County of Oneida,* 375 F.3d 206, 221 (2d Cir. 2004). However, to withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co*., 853 F.2d 151, 155 (2d Cir. 1988). This is so because "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases*." Meiri*, 759 F.2d at 998 (2d Cir. 1985).

Finally, although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Cntr. v. Hicks*, 509 U.S. 502, 507 (1993); *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998)("the thick accretion of cases interpreting the burden shifting framework should not

obscure the simple principle that lies at the core of anti-discrimination cases . . . the plaintiff has the ultimate burden of persuasion). With these standards in mind, the Court addresses Wills' allegations.

> 2.    *Application to Wills' Remaining Discrimination Claims*

As stated above, Wills asserts that CSC wrongfully disciplined and terminated him because he is a black man.  CSC does not dispute that Wills was a member of a protected class with respect to each of his claims.  It does dispute, however, that Wills suffered an adverse employment action with respect to his complaints about the written and verbal disciplinary notices he received.  Def.'s 56.1 Stmt. ¶¶ 65, 144.  Moreover, CSC contends that it had legitimate nondiscriminatory reasons for terminating Wills and that he has failed to present sufficient evidence that the reasons it has articulated for its decisions are a pretext.

> a.    The Adverse Employment Actions

"A plaintiff suffers an adverse employment action when [he] experiences a "materially adverse change in the terms and conditions of employment.  Typical adverse employment actions may include termination from a job, decrease in salary, material reduction in benefits or responsibilities, or a less distinguished title." *Weisbecker v. Sayville Union Free Sch. Dist.*, 890 F. Supp. 2d 215, 233 (E.D.N.Y. 2012) (internal citations omitted).  In the scant, two-page argument Will submitted in opposition to the motion, Wills simply states:

> 3.   "He [or she] was subjected to an adverse employment action[.]"

> As a result of the being more harshly penalized than his Caucasian colleagues Mr. Wills was terminated. (Pl.'s Resp. ¶¶ 124, 140, 142, 234).

> 4.   "The adverse employment action occurred under circumstances giving rise  to  an inference of discrimination"

Mr. Wills's (sic.) Caucasian colleagues who committed the same infraction did not experience similarly harsh punishments.  (Pl.'s Resp. ¶¶ 124, 140, 142, 234).

Pl.'s Mem. at 3.  Even if Wills had come forward with evidence that his penalties were harsher that his coworkers, which he has not, the actions taken by CSC to address his conduct do not constitute adverse employment actions.  As Judge Bianco noted in *Weisbecker*:

> Threats of termination do not, by themselves, constitute an adverse employment action as a matter of law. . . . This is especially true, . . ., where (1) the recommendation was made by [a person], who was not the final decision maker with respect to termination, (2) plaintiff was notified of the recommendation of termination . . . , and (3) plaintiff was afforded extensive process . . ..

Although Wills was put on multiple action plans and received numerous verbal and written warnings, until his ultimate termination, which will be discussed below, Wills was not fired, suspended or demoted as a result of any of the disciplinary notices or warning, nor did they affect his wages.  Def.'s 56.1 Stmt. ¶¶ 64, 76, 99, 135.  Accordingly, the Court finds that other than the termination in 2016, Wills did not suffer an adverse action.  The Court, therefore, turns its attention to the termination.

> b.   No Inference of Discrimination

Even if Wills could establish a *prima facie* case of discrimination with respect to his termination, Wills' discrimination claims would not survive a motion for summary judgment because CSC has articulated a nondiscriminatory reason for its actions and there is absolutely no evidence of a pretext.  Indeed, CSC has introduced ample, undisputed evidence to establish that it had a legitimate nondiscriminatory reason to terminate Wills:

- On July 11, 2013, Wills sent an email to his manager copied to all RAEs in his office stating, among other things "when [CSC] gets serious about fairly paying the quality people they really seek, please send me another email."

29

- On September 19, 2013, Wills]sent his manager (his former supervisor's boss) an email calling his former supervisor a "rat," and saying, "he cannot be trusted."

- Wills unfriended supervisors from the Find Friends application on his company issued iPad even after his supervisors told him not to do so, and further admits that he asked a supervisor "What is with all of you and this app?" when a supervisor asked a group of RAEs if their Find Friends application was on, and, when the supervisor began to explain its importance, walked out and said he would take personal time for the rest of the day.

- Wills repeatedly sent emails to his supervisors saying, "are you kidding me?" in response to coachings to follow the CSC's policies.

- Wills sent a November 3, 2015 email complaining that a supervisor was "trying to snitch" on him and calling the supervisor "inaccurate and childish."

- Wills was on a non-company website during a work meeting.

- One of his supervisors was deleted from his Find Friends application on his iPad and, even though Wills denies that he deleted that supervisor, no one but him had access to his company-issued iPad.

- Wills]repeatedly placed orders without a customer's social security number, against CSC's policy, even after being coached not to do so.

- Wills stated in a February 17, 2016 "Boost Meeting" in which his manager was reminding the RAEs about professional conduct that "It's ok to vent with each other and to speak negatively and we all need to hear the good, bad and the ugly." He further admits making a comment at that meeting characterizing a supervisor as giving advice that "rose to a level of incompetency."

- On May 7, 2016, Wills responded to a supervisor's correction of his misspelling of another supervisor's name with an email stating "it's insulting,. . . please stop!"

- Wills received repeated warnings for his behavior, both in writing and verbally.

*See* Def.'s Mem. at 8-9 (internal citations omitted); *see also Schnabel v. Abramson*, 232 F.3d 83,

87-88 (2d Cir. 2000) (insubordination and difficulty following instruction were nondiscriminatory reasons for alleged adverse action). Moreover, while the disciplinary action taken by CSC is primarily focused on Wills' attitude and conduct, it is similarly undisputed that Wills failed to meet his annual sales goals numerous times. Taken as a whole, Wills' conduct was certainly a legitimate basis upon which to terminate his employment. Accordingly, the Court turns its attention to the CSC's motivation for doing so.

### c.    Wills' Evidence of Pretext

In his memorandum in opposition to the motion, Wills offers a single, conclusory sentence in support of his claim that CSC's explanation for its decision to terminate him is a pretext, namely, "The adverse employment action occurred under circumstances giving rise to an inference of discrimination." Indeed, Wills has not offered sufficient evidence on which a reasonable person could infer that CSC had a discriminatory motive when it terminated his position. Wills simply states that his white co-workers like Ulysses Colon, Joseph Graci, Michael Sedlack, Robert Sharpe, Richard Cuba and James DiSilvio were treated differently than him. Def.'s 56.1 Stmt. ¶ 137. To this end, Wills claims that the above-referenced individuals were also outspoken in meetings and were not terminated. *Id*. ¶ 142. For example, Wills complains that Robert Sharpe was on his company computer during a boost meeting and no one told Sharpe to pay attention. *Id*. ¶ 220. Wills also argues that Colon had numerous company violations, including refusing to answer phone calls or to respond to phone calls by members of management, but he was not terminated. *Id*. ¶ 140. Similarly, Wills alleges that Mark Schutzmann, a former CSC employee, had made "mistakes" entering information into the Customer Verification Tool and was not disciplined for his error. *Id.* ¶ 124. Yet, Wills admits that he has no real knowledge of any of those individuals' performance ratings, sales figures,

supervisors, discipline history, personnel file contents or length of tenure at CSC. *Id*. ¶ 138. He was also unable to recall, at his deposition, if any of those individuals had been reprimanded for failing to collect social security numbers from customers or whether any of those individuals had refused to keep their Find Friends application on. *Id*. ¶¶ 139-40. While "evidence of disparate treatment of similarly situated individuals allows for the conclusion that the reasons advanced by an employer in a Title VII context are pretextual," a plaintiff who seeks to establish disparate treatment must show that the employee to whom she compares herself is "similarly situated in all material respects." *Summa v. Hofstra Univ.,* 708 F.3d 115, 131 (2d Cir. 2013). Wills has not done so.

Wills also testified at his deposition that Zimmermann did not like him and that he "believed" such purported dislike was due to his race and color. Similarly, Wills testified that it was "possible" he received certain warnings because of his race or color. However, Wills has failed to present any evidence to support those "beliefs." *See McGill v. Univ. of Rochester*, 600 F. App'x 789, 791 (2d Cir. 2015) (requiring more than "conclusory and sometimes contradictory allegations" to establish pretext); *Smith v. Am. Exp. Co*., 853 F.2d 151, 155 (2d Cir. 1988) (plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight."). Accordingly, the Court finds that Wills has failed to establish that CSC's reasons for its decisions to terminate him were merely pretextual. As such, the undersigned recommends that Wills' Title VII, the NYSHRL, the NCHRL and § 1981 discrimination claims based on race and color be dismissed.

### D.   Wills' Remaining Retaliation Claims

The Court, similarly, finds Wills' Title VII, Section 1981 and the NYSHRL retaliation claim lacking sufficient evidence. To establish a *prima facie* case of retaliation, a plaintiff must

show that: (1) he participated in an activity protected under Title VII; (2) the employer was aware of her participation in the protected activity; (3) the employer took adverse action against him based on his protected activity; and (4) there was a causal connection between the protected activity and the adverse action taken by the employer. *See Kessler v. Westchester County Dep't of Social Servs.*, 461 F.3d 199, 206 (2d Cir. 2006). The "protected activity" element of a retaliation case turns upon whether the employee has protested an unlawful employment practice, within the meaning of Title VII. *Wimmer v. Suffolk Co. Police Dep't*, 176 F.3d 125, 135, (2d Cir. 1999). Here, Wills asserts that in 2016, he complained to Long, Vice President of HR, that he felt Agnant was prevented from going on a work trip based on her being a black woman. Pl.'s Mem. at 3-4. He further states, in a conclusory fashion, that while he did not know the particulars of Agnant's employment history, CSC had a "record of penalizing minority employees more harshly than non-minority employees who might have committed the same infraction." Although Wills was terminated with 4 months of his complaint to Long, the record is utterly devoid of evidence that CSC's decision to terminate him was in any way linked to that complaint. Indeed, other than the timing, Wills has presented no evidence to establish a causal connection between his complaint to Long and his termination. Accordingly, the undersigned also recommends that Wills retaliation claims be dismissed in their entirety.

## OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. Such objections shall be filed with the Clerk of the Court via ECF. Any requests for an extension of time for filing objections must be directed to Judge Azrack prior to the expiration of the fourteen (14) day period for filing objections. Failure

33

to file objections within this period waives the right to appeal the District Court's Order.  *See* 28 U.S.C. § 636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc*., No. 17-3446, 2018 U.S. App. LEXIS 28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived any objections to the Magistrate's finding" by failing to timely object); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:   Central Islip, New York
        November 6, 2020

                              _____/s_____
                              ARLENE R. LINDSAY
                              United States Magistrate Judge

34